SPS

COMMONWEALTH OF VIRGINIA
### CIRCUIT COURT OF FAIRFAX COUNTY
4110 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
703-691-7320
(Press 3, Press 1)

John Vannoy vs. Federal Reserve Bank of Richmond, The

CL-2012-0015979

TO:    David E. Nagle, Esq.
       Jackson Lewis LLP
       1021 E. Cary Street, Suite 1200
       Richmond, VA 23219
       Attorney for the Federal Reserve Bank of Richmond

## SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

## APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.

Done in the name of the Commonwealth of Virginia, on Wednesday, October 09, 2013.

JOHN T. FREY, CLERK

By: _____
                Deputy Clerk

Plaintiff's Attorney  Mary Ann Kelly

FAIRFAX COUNTY CIRCUIT COURT
19th JUDICIAL CIRCUIT OF VIRGINIA

JOHN VANNOY )
)
    Plaintiff, )
) Case No: **2012  15979**
v. )
)
THE FEDERAL RESERVE BANK )
    OF RICHMOND, )
)
    Defendant. )

## COMPLAINT

Plaintiff John Vannoy presents claims based on violations of the Americans with

Disabilities Act, as amended by the ADA Amendments Act of 2008 ("the ADA") and the Family

and Medical Leave Act ("the FMLA") which arose during his employment with the Federal

Reserve Bank of Richmond ("the Bank").

### JURISDICTION AND VENUE

This court has jurisdiction pursuant to 12 U.S.C. §341(Fourth).  Jurisdiction is also proper

under 42 U.S.C. §12117, which incorporates by reference §706(f) (3) of Title VII of the Civil

Rights Act of 1964 and 42 U.S.C. 1981a; and under 29 U.S.C. §2617(a) (2).  Venue is proper

under Va. Code Sec 8.01-262.  Plaintiff timely filed this action after properly exhausting his

administrative remedies under the ADA in the United States Equal Employment Opportunity

Commission ("EEOC").

### PARTIES

1.    Plaintiff John Vannoy is an adult male.  He is a citizen and resident of Virginia.

2.    Defendant Federal Reserve Bank of Richmond (hereinafter "the Bank") is one of

twelve regional reserve banks that work to strengthen local economies and communities.  Among

1

other things, the Banks supervises and regulates financial institutions within its regions. The

Bank's regions include Virginia, Maryland, the Carolinas, the District of Columbia and parts of

West Virginia. The Bank does business throughout Virginia, including in Fairfax and other

locations in Northern Virginia. The Bank is an employer within the meaning of the ADA and the

FMLA.

## FACTS

### Vannoy Enjoyed a Long History of Excellent Performance

3.      Vannoy is a Professional Engineer who was awarded a B.S. degree in Civil

Engineering from the University of Missouri in 1984, and then began work in project

management.

4.      In January of 1994, Vannoy was hired by the Bank as a Building and Equipment

Assistant Manager. He enjoyed a successful career until he was wrongfully terminated effective

December 21, 2010.

5.      For years during his employment with the Bank, Vannoy suffered from

Depression and was treated for this disability by health care professionals.

6.      Despite his struggle with Depression, Vannoy's tenure at the Bank spanned more

than 16 years and was highly successful. His hard work and dedication earned him a series of

promotions, each of which carried increased responsibility and pay, such as from Assistant

Manager, to Manager, to Senior Manager, to Senior Manager & Technical Director of

Construction. Finally, Vannoy was promoted to Senior Facility Project and Construction

Manager & Technical Services Director in the Facilities Management department of the Bank,

which is the position he held at the time of his termination.

2

7.      During his employment with the Bank, Vannoy was sometimes under considerable pressure on account of work demands.   Pressure on Vannoy increased during the last year of his tenure and Vannoy's Depression likewise increased.

### Vannoy's Depression Worsens

8.      Around September of 2010 Vannoy was diagnosed with Major Depression. During this time his alcohol consumption also increased markedly.   At times one or more of Vannoy's major life activities were significantly limited by Depression and/or Alcohol Dependency.   For instance, in the Fall of 2010 Vannoy's ability to eat, sleep, communicate, and/ or think were at time significantly affected.   Because of these disabilities, Vannoy sometimes needed some time off work.

9.      From approximately the Fall of 2009 and on, Vannoy's immediate supervisor was Robert Minteer, Assistant Vice President.   Minteer reported to Mattison Harris, Vice President.

10.      Before Harris became Vice President, Vannoy and Harris worked together for many years.   They had become friends and shared aspects of their personal lives with each other. Harris was well aware that Vannoy suffered from Depression.

11.      As a member of Senior Management, when Vannoy took time off work there was no specific procedure he had to use to notify the Bank.   Generally, when he needed to take time off, Vannoy would text or email Minteer or another appropriate person to let them know. Minteer and others acknowledged and accepted Vannoy's texts, even when Vannoy texted the morning of a day he took off.   No one at the Bank complained to Vannoy nor did anyone suggest that there was a problem in the way he handled his absences from work.

3

## The Bank's Management Was Well Aware of Vannoy's Disabilities

12.     In the beginning of November 2010, Vannoy became very ill with Depression and Alcohol Dependency. On several occasions, he was unable to come to work. Vannoy notified Management by email and/or text that he would not be in but did not provide much detail as to why. No one at the Bank complained to Vannoy about his absences, or about the way he notified the Bank that he would be absent.

13.     Victor M. Brugh, M.D. is a member of the Bank's Senior Management who has served as its Medical Director since 2000.

14.     Dr. Brugh provided in-house medical treatment for Vannoy for several months before his employment was terminated. Dr. Brugh knew that Vannoy suffered from Depression and Alcoholism. Dr. Brugh communicated information about Vannoy's drinking and health to the Bank's management.

15.     Vannoy was admitted to the hospital for treatment of severe Depression and Alcohol Dependency on or about November 10, 2010. The night before the admission, Vannoy's family notified Management and made it clear that Vannoy would not be able to go on a planned work trip to Baltimore.

16.     Dr. Brugh called Vannoy during his hospital admission. During the call, Dr. Brugh acknowledged Vannoy's alcoholism and told him that he needed rehabilitation. Vannoy's sister also spoke with Dr. Brugh regarding his Depression and Alcoholism. However, Dr. Brugh did nothing to communicate to Vannoy or his family the Bank's policies on the ADA or the FMLA, nor did he make any attempt to indicate that Vannoy's job would be protected if he did go into treatment for his Alcoholism.

4

17.     Vannoy did not know how to handle his disabilities with the Bank. He did not know about his rights under the ADA or the FMLA. He was not aware of the Bank's policies on the ADA or the FMLA. If the Bank had advised Vannoy of his right to take medical leave without losing his job, he would have done so to enter rehabilitation. As it was, Vannoy was convinced that he had to get back to work as soon as he possibly could. He was scared and worried that he would be fired if he took extended medical leave, or if his Managers knew how sick he was.

18.     Nonetheless, Vannoy wanted his Managers to know how much he was struggling, and that he desperately wanted to work with the Bank. Accordingly, upon his return to work Vannoy asked to meet with Minteer and Harris.

19.     On November 18, 2010, Vannoy met with Minteer and Harris. As Vannoy began explaining why he had asked to meet with them, Harris interrupted and told Vannoy that he did not need to tell them about his health. Vannoy persisted that he wanted them to know what he had been dealing with. He explained that he was being treated for severe Depression, that his alcohol use had significantly increased, and that he had just been released from the hospital. Vannoy reminded Harris how serious Depression can be.

20.     During the above meeting, Vannoy made it clear to his Managers that he would continue to struggle with these health issues. However, Vannoy stated emphatically that he wanted his job and would do his best to work with the Bank. Harris and Minteer volunteered to Vannoy that his job was not in jeopardy, and emphasized that his job had never been in jeopardy.

21.     Even after Vannoy made a point of disclosing his disabilities to Management, no one from Management, Human Resources, or anyone else at the Bank followed up with him to discuss his need for leave or an accommodation. The Bank still failed to mention its ADA policy

5

to Vannoy, nor did the Bank ask him for additional medical information to assess his condition and discuss the propriety of accommodations with him. Vannoy still did not know the Bank's ADA policy nor did he know about his rights under the ADA.

22.   Similarly, no one from the Bank followed up to discuss the FMLA or the Bank's FMLA policy to Vannoy. The Bank never provided Vannoy with a statement describing his rights and responsibilities under the FMLA. Vannoy did not know his rights under the FMLA.

23.   Despite Vannoy's struggle his work remained good. Up to this point, no one at the Bank had suggested to Vannoy that there was any problem with his performance or that his absences had adversely affected his work. The Bank did not provide Vannoy with any guidance or information indicating that it wanted him to change how he handled leave.

24.   Vannoy missed some additional work, but reported that he would not be at work to the appropriate personnel.

<u>The Bank Retaliated Rather Than Accommodate Vannoy</u>

25.   On or about December 16, 2010, Vannoy was written up and disciplined for the leave he had taken in connection with his disabilities. He was presented with a performance Evaluation of "Good," a downgrade for him. The sole criticism reflected in the Evaluation was for such things as "failing to come to work for several days . . . [and] not communicat[ing] that his absence would be for over a week." Alarmed, Vannoy reminded Minteer that his absences were due to the fact that he was dealing with serious health issues. He also pointed out that he had worked overtime, weekends, and holidays to successfully complete his projects ahead of schedule. Minteer did not discuss with Vannoy any way that his absences had adversely affected the projects he was working on.

6

26.     Also at the December 16 meeting, Vannoy was put on a Performance Improvement Plan ("PIP"). This was the first and only time Vannoy had ever been written up during his tenure with the Bank. But the PIP was not a "performance" plan at all. The sole issue addressed in the PIP was Vannoy's ongoing need for leave. The PIP singled Vannoy out and created a strict new procedure for him to follow when he wanted to take leave, specifically including medical leave. The new leave procedure was created without consultation with Vannoy, without requesting input from Vannoy's doctors, and without taking into account the symptoms and challenges of his disabilities.

27.     Still the quality of Vannoy's work remained high. Indeed, just before he was written up, Vannoy received a substantial check as incentive pay/ bonus for having completed his 2010 projects ahead of schedule.

#### Vannoy Was Fired After He Suffered an Anxiety Attack at Work

28.     On Monday December 20, 2010, Vannoy experienced a severe anxiety and depressive episode triggered by a family crisis. He timely communicated his need to take leave that day to Minteer and heard nothing back.

29.     When Vannoy arrived at work the next morning Harris brought him into his office, where Minteer was on speaker phone. Vannoy was chastised for texting Minteer to report his need for medical leave the day before, rather than calling Minteer on the phone as they wanted him to do. After Harris hung up with Minteer, Vannoy broke down. Vannoy tried to explain the crisis he was suffering but had trouble communicating because he was shaking and crying. Harris assured Vannoy that he would not be terminated, but told Vannoy to fill out his PIP paperwork. Vannoy tried to compose himself and went to his office to carry out Harris' instruction.

7

30.   Once in his office, Vannoy broke down again and could not gain control of himself.  He was unable to log onto his computer, concentrate, or think straight.  Vannoy realized that he was having some sort of anxiety attack that rendered him unable to work, thus decided to take the paperwork home to complete.  As he was leaving, Vannoy ran into Harris.  Still in an obvious state of severe emotional and physical distress, Vannoy told Harris that he did not belong at work and needed to go home.  Harris told Vannoy to go back to his office.  Vannoy went back to his office to try again, but was too upset to function and left work.

31.   Upon arriving to work the next morning, December 22, Vannoy was denied access to the facility by one of the Bank's law enforcement officers.  He returned home.

32.   On December 23, Vannoy received a letter from the Bank informing him that his employment was terminated effective December 21, 2010.  The letter characterized Vannoy's breakdown and need to leave as "insubordinate behavior."  It also falsely alleged that management had conducted several performance discussions with him over the past two months; there had been no such "performance" discussions.  Vannoy was shocked and distressed.

33.   After efforts to reason with the Bank's management were unsuccessful, Vannoy formally appealed his termination to Sally Green, First Vice President of the Bank.  Vannoy explained the health issues he faced, his need for medical treatment, and he tried to correct misstatements regarding his performance.  The Bank still failed to follow up with Vannoy to investigate his medical condition or need for accommodation and leave.  Rather, Green ignored Vannoy's disabilities and upheld his termination in a letter dated April 8, 2011.

34.   The Bank's assertion that Vannoy's "performance" was poor is false and a pretext for illegal discrimination.  Vannoy's 2010 Performance Evaluation demonstrates that his work performance remained strong.  He continued to use his skills effectively in service to the Bank.

8

35.     The Bank's discrimination and retaliation caused Mr. Vannoy to experience damage, including emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

36.     The Bank's wrongful conduct caused Vannoy to lose compensation (including wages and insurance), employment opportunities, bonuses, and other benefits of employment.

37.     The Bank's conduct was intentional, willful, and exhibited a reckless disregard for the rights of Vannoy; it was taken in the face of a perceived risk that their actions would violate federal law prohibiting discrimination on the basis of disability; and the imposition of punitive damages is warranted.

### CLAIMS

### DISCRIMINATION AND RETALIATON IN VIOLATION OF THE ADA

38.     The allegations of the other paragraphs are incorporated as if fully re-alleged herein.

39.     Depression is a disability under the ADAAA.

40.     Alcohol Dependency is a disability under the ADAAA.

41.     Vannoy was a qualified individual with one or more disabilities at all times relevant hereto, Depression and Alcohol Dependency.   At all times relevant hereto, Vannoy was able to perform the essential functions of his job with or without reasonable accommodation.

42.     The Bank discriminated and retaliated against Vannoy after he disclosed his disabilities to the Bank's management in November 2010, by, among other things, downgrading his Performance Evaluation and placing him on a PIP. The Bank failed to advise Vannoy of his ADA rights, and failed to engage in an interactive process to explore the propriety of accommodations that would allow him to keep his job. Rather than work to reasonable

9

accommodate Vannoy's disabilities by, for instance, providing him with leave or a flexible or modified work schedule, the Bank unilaterally imposed unnecessary attendance requirements that failed to account for the nature of his disabilities. The Bank's conduct led Vannoy to fear losing his job on account of his disabilities. The Bank also failed to reasonably accommodate Vannoy's obvious depression and anxiety on December 21, and discriminated against him, by characterizing his breakdown and need for accommodation as insubordination. The Bank discriminated against Vannoy by, among other things, firing him on account of his disabilities and need for accommodation, and falsely accusing him of poor performance.

43.     The Bank violated the American with Disabilities Act (ADA), amended by the American with Disabilities Act Amendments Act of 2008 (ADAAA), 42 U.S.C. 12101 *et seq.*

## INTERFERENCE WITH VANNOY'S FMLA RIGHTS

44.     The allegations of the other paragraphs are incorporated as if fully re-alleged herein.

45.     Depression is a serious health condition under the FMLA.

46.     Alcohol Dependency is a serious health condition under the FMLA.

47.     The Bank interfered, restrained, and denied Vannoy his FMLA right to take 12 weeks of medical leave. Vannoy had the right to take 12 weeks of medical leave under the FMLA. He had not taken anywhere near this amount of time off. The Bank failed to carry out its duty to advise him of his FMLA rights and responsibilities. It failed to carry out its duty to work with Vannoy by, among other things, advising him he had the right to take medical leave for needed treatment and rehabilitation without losing his job. Rather than work with Vannoy so that he could balance his work obligations with his need for medical leave, the Bank's conduct

made Vannoy fearful that taking the leave he needed to obtain treatment for his serious health conditions would result in the loss of his job.

48.     The Bank also discriminated and retaliated against Vannoy after he took medical leave for his serious health conditions, including leave for his hospital admission, by, among other things, downgrading his Performance Evaluation and placing him on a PIP. Rather than grant Vannoy medical leave for his obvious depression and anxiety on December 21, the Bank characterizing his breakdown and need for medical leave as insubordination. The Bank further discriminated against Vannoy by firing him on account of his serious health conditions and continuing need for medical leave to obtain treatment for them, and by falsely accusing him of poor performance.

WHEREFORE, Plaintiff Vannoy requests that the Court enter judgment in his favor and against Defendant on each and every one of the above counts, and on all counts, and further:

1. Award Mr. Vannoy compensatory and punitive damages in an amount to be determined by the jury; and

2. Award Mr. Vannoy his attorneys fees, costs, and other expenses; and

3. Award Mr. Vannoy pre and post judgment interest; and

4. Award Mr. Vannoy all such further relief, including equitable relief, as is just and proper.

### JURY DEMAND

Plaintiff Vannoy demands a trial by jury on all issues so triable.

11

Respectfully submitted,

Mary Ann Kelly, Esq. VSB #32786
The Law Office of Mary Ann Kelly
3977 Chain Bridge Road
Suite 301
Fairfax, Virginia 22030
Phone     (703) 865-5032
Facsimile (703) 865-5832

12